ORAL ARGUMENT NOT YET SCHEDULED

BRIEF FOR APPELLEE

———————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

No. 23-3005

———————————

UNITED STATES OF AMERICA,        Appellee,

v.

TROY SARGENT,        Appellant.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
NICHOLAS P. COLEMAN
MICHAEL J. ROMANO
* ERIC HANSFORD
D.C. Bar #1017785
Assistant United States Attorneys
* Counsel for Oral Argument
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Eric.Hansford@usdoj.gov
Cr. No. 21-258 (TFH)        (202) 252-6829

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee hereby states as follows:

## Parties and Amici

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the brief for appellant.

## Rulings Under Review

References to the ruling at issue appear in the brief for appellant.

## Related Cases

Appellee is unaware of any related cases. This case has not previously been before this Court.

## STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations are contained in the brief for appellant.

# TABLE OF CONTENTS

INTRODUCTION .................................................................... 1

COUNTERSTATEMENT OF THE CASE ......................................... 2

    Offenses and Plea ........................................................ 3

    Sentencing .................................................................. 8

        Relevant Statutory and Guidelines Provisions ......................... 8

        Sentencing Hearing ................................................... 10

SUMMARY OF ARGUMENT .................................................... 13

ARGUMENT ...................................................................... 15

The Sentencing Commission's Definition of "Aggravated Assault" in § 2A2.2 Controls .......................................... 15

    A.   Standard of Review and Degree of Deference ................... 15

    B.   Argument ............................................................. 19

        1.   Text and plain meaning ......................................... 19

        2.   Structure ......................................................... 23

        3.   Background and Purpose ....................................... 29

            a.   History of § 2A2.2 .......................................... 29

            b.   Federal Law ................................................. 31

            c.   State Law .................................................... 36

CONCLUSION .................................................................... 41

# TABLE OF AUTHORITIES*

*Auer* v. *Robbins*, 519 U.S. 452 (1997) ...................................................... 16

*Bellagio, LLC v. NLRB*, 863 F.3d 839 (D.C. Cir. 2017) ........................... 20

*Bowles* v. *Seminole Rock & Sand Co.*, 325 U.S. 410 (1945) ............. 16, 17

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ........................... 13, 16, 17, 18, 19

*Nielsen v. Preap*, 139 S. Ct. 954 (2019) .................................................... 26

*Quarles v. United States*, 139 S. Ct. 1872 (2019) ............................... 36, 38

*Stinson* v. *United States*, 508 U.S. 36 (1993) ........................ 11, 15, 16, 19

*Tabb v. United States*, 141 S. Ct. 2793 (2021) ........................................ 18

*Taylor v. United States*, 495 U.S. 575 (1990) .................................... 38, 39

*United States v. Booker*, 543 U.S. 220 (2005) ........................................ 15

*United States v. LaBonte*, 520 U.S. 751 (1997) ...................................... 28

*United States v. McKeever*, 824 F.3d 1113 (D.C. Cir. 2016) ................... 25

*United States v. Page*, 84 F.3d 38 (1st Cir. 1996) .................................. 31

*United States v. Salvador Sandoval*, No. 21-195-02
 (D.D.C. Aug. 3, 2023) ............................................................................ 31

*United States v. Turner*, 21 F.4th 862 (D.C. Cir. 2022) .......................... 15

---

\* Authorities upon which we chiefly rely are marked with asterisks.

\* *United States v. Valdez-Torres*, 108 F.3d 385 (D.C. Cir. 1997) ........ 27, 29

*United States v. Vargas*, 74 F.4th 673 (5th Cir. 2023) ........................... 18

*United States v. Vederoff*, 914 F.3d 1238 (9th Cir. 2019) ........... 36, 39, 40

## Other Authorities

18 U.S.C. § 111 ................................................................................ 35

18 U.S.C. § 111(a) ........................................................................ 8, 35

18 U.S.C. § 111(a)(1) .......................................................................... 3

18 U.S.C. § 113 ............................................................................ 34, 35

18 U.S.C. § 113(a)(2) .................................................................... 14, 24

18 U.S.C. § 113(b) .............................................................................. 25

18 U.S.C. § 115 .................................................................................. 32

18 U.S.C. § 231(a)(3) ...................................................................... 2, 9

18 U.S.C. § 1752(a)(1) ......................................................................... 3

18 U.S.C. § 1752(a)(2) ......................................................................... 3

18 U.S.C. § 1752(a)(4) ......................................................................... 3

18 U.S.C. § 3553(a) ............................................................................ 12

18 U.S.C. § 3559(a) ............................................................................ 32

28 U.S.C. § 994(c)(1), (4) .............................................................. 31, 34

40 U.S.C. § 5104(e)(2)(F) .................................................................... 3

U.S.S.G § 2A2.2 ........................................................... passim

U.S.S.G. § 1B1.2(a) ........................................................ 24

U.S.S.G. § 2A.2.3 ........................................................... 29

U.S.S.G. § 2A2.1 .......................................... 29, 30, 33, 34

U.S.S.G. § 2A2.2(a) ....................................... 9, 26, 27, 35

U.S.S.G. § 2A2.2(b) ............................................... 9, 26

U.S.S.G. § 2A2.2(b)(2) .......................................... 27, 29

U.S.S.G. § 2A2.2(b)(2)(B) .......................................... 28

U.S.S.G. § 2A2.2(b)(3) .......................................... 27, 29

U.S.S.G. § 2A2.2(b)(3)(B) ...................................... 31, 35

U.S.S.G. § 2A2.2(b)(7) ............................................... 35

U.S.S.G. § 2A2.4 ............................ 8, 10, 11, 12, 30, 31, 35

U.S.S.G. § 2A2.4(a) ................................................... 35

U.S.S.G. § 2A2.4(b)(1)(A) ........................................... 35

U.S.S.G. § 2A2.4(c) ............................................... 9, 10

U.S.S.G. § 2A3.1 ..................................................... 33

U.S.S.G. § 2A3.2 ..................................................... 24

U.S.S.G. § 2A3.3 ................................................. 24, 33

U.S.S.G. § 2X5.1 ..................................................... 10

U.S.S.G § 3A1.2 ........................................................................ 35

U.S.S.G. § 3A1.2(b) ................................................................. 35

U.S.S.G. § 4B1.2 ...................................................................... 36

2 Jehns D. Ohlin, *Wharton's Criminal Law* § 23:11
 (16th ed. Sept. 2022 update) ............................................. 23

2 *Model Penal Code* § 211.1 cmt. 1(c) ................................... 21

2 Wayne R. LaFave, *Substantive Criminal Law* § 16.3(d)
 (3d ed. Oct. 2022 update) .................................................. 23

*Black's Law Dictionary* (11th ed. 2019) .............................. 20

Federal Judiciary Protection Act of 2002, Pub. L. No. 107-273, § 11008(e),
 116 Stat. 1758 ..................................................................... 35

Federal Judiciary Protection Act of 2002, Pub. L. No. 107-273, § 11008(e),
 116 Stat. 1819 ..................................................................... 35

Fla. Stat. § 784.021 ............................................................... 38

Ga. Code § 16-5-21(a) ............................................................ 38

Idaho Code § 912 ................................................................... 39

Idaho Code § 18-909 .............................................................. 39

Kan. Stat. § 21-5412 .............................................................. 38

Md. Code, Art. 27, § 12 (repealed 1996) .............................. 40

Md. Code, Crim. Law § 14-101(16) ....................................... 39

Md. Code, Crim. Law § 14-101(21) ....................................... 39

vii

*Model Penal Code* § 211.1(2) ................................................... 22

N.M. Stat. § 30-3-2 ............................................................. 38

Okla. Stat. tit. 21, § 681 ...................................................... 39

Tenn. Code § 39-2-101 ........................................................... 40

Wash. Rev. Code § 9A.36.021 ..................................................... 39

## ISSUE PRESENTED

Whether the Sentencing Commission permissibly defined "aggravated assault" in U.S.S.G. § 2A2.2 to include felonious assault with an intent to commit another felony, thus capturing appellant Troy Sargent's assault on a Capitol Police officer on January 6, 2021, with intent to commit civil disorder.

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 23-3005

_____

UNITED STATES OF AMERICA,                       Appellee,

v.

TROY SARGENT,                                   Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BRIEF FOR APPELLEE

_____

**INTRODUCTION**

During the January 6, 2021, attack on the U.S. Capitol, appellant
Troy Sargent made his way to the front of the rioting crowd and hit a
U.S. Capitol Police officer trying to hold the police line. He berated the
officers as "traitors." And in the days after the attack, he bragged about
punching a defenseless "rookie officer." Sargent pleaded guilty to all

charges in the superseding indictment, which included felony charges for assault of a federal officer and civil disorder.

Sargent's sole challenge on appeal is to the U.S. Sentencing Guidelines commentary, which defines assault with intent to commit another felony as an "aggravated assault," thus recommending a higher sentencing range for Sargent's conduct. While circuits disagree about the level of deference afforded to Guidelines commentary, this case does not require this Court to weigh in on that debate. Under any standard of review, the commentary's definition is clearly permissible. "Aggravated assault" is commonly defined to include assault with intent to commit another crime. And the Guidelines' structure affirmatively requires that definition here. More broadly, federal law makes convictions for assault with intent to commit another crime serious felonies, contrary to Sargent's proposal to treat them like misdemeanors. Sargent's sentence should be affirmed.

## COUNTERSTATEMENT OF THE CASE

After the January 6 attack on the Capitol, Sargent was charged in a six-count superseding indictment with Civil Disorder (18 U.S.C. § 231(a)(3)); Assaulting, Resisting, or Impeding Certain Officers,

2

involving physical contact with the victim and the intent to commit another felony (18 U.S.C. § 111(a)(1)); Entering and Remaining in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(1)); Disorderly and Disruptive Conduct in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(2)); Engaging in Physical Violence in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(4)); and Act of Physical Violence in the Capitol Grounds or Building (40 U.S.C. § 5104(e)(2)(F)) (Appendix (A) 8-10). Sargent pleaded guilty to all counts before the Honorable Thomas F. Hogan (A5; A11-16). On December 12, 2022, Judge Hogan sentenced Sargent to a total of 14 months of imprisonment and 24 months of supervised release, entering judgment on December 20 (A152-58; see A6; A17-24). Sargent appealed on January 3, 2023 (A25).

## Offenses and Plea

On January 6, 2021, Sargent assaulted a U.S. Capitol Police officer on U.S. Capitol grounds by twice swinging his open hand towards the officer. The first swing hit the officer. The second swing, 30 seconds later, missed the officer and instead hit another rioter. Sargent pleaded guilty to the superseding indictment without a plea agreement, but with a

stipulated statement of offense and an admission to the essential elements of each offense (see A11-16).

On January 6, the U.S. Capitol and surrounding grounds were closed to unauthorized members of the public (A11-12). That day, a joint session of Congress was meeting in the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, with then-Vice President Mike Pence presiding (A11-12). At approximately 1:30 p.m., the House and Senate adjourned to their separate chambers to resolve an objection (A12). Meanwhile, a large crowd had gathered outside the Capitol (A12). Members of the crowd forced their way past the perimeter barricades and Capitol Police officers, and eventually the crowd advanced to the exterior façade of the building (A12). Shortly after 2:00 p.m., some members of the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, encouraged and assisted by the larger crowd (A12). At approximately 2:20 p.m., Vice President Pence and Members of Congress evacuated the chambers for their safety, suspending the congressional proceedings (A13). Proceedings could not resume until approximately 8:00 p.m., after the building was secured (A13).

The parties agreed that Sargent had participated in the riot by assaulting a Capitol Police officer who was attempting to hold the police line in the West Plaza:

> Body-worn camera footage, recorded by a nearby Metropolitan Police Department officer who was assisting members of the U.S. Capitol Police, shows [Sargent] near the front of a group of rioters that stood opposite a police line. At approximately 2:30 p.m., [Sargent] stepped forward from the crowd and swung his open hand towards a U.S. Capitol Police officer, making contact with the officer. Immediately thereafter, another officer instructed [Sargent] and others, "Do not start attacking people." Thirty seconds later, at approximately 2:31 p.m., [Sargent] again advanced toward the front of the crowd, swung his open hand towards the same officer, but instead made contact with another member of the crowd. [Sargent] then walked back deeper into the crowd.

> [ ]When [Sargent] made contact with the nearby member of the crowd, he intended to make contact with the same officer at whom he swung his hand thirty seconds earlier. Indeed, [Sargent] believed that his hand connected with the officer, not a fellow rioter. In a Facebook message to group of approximately 50 people, sent after the riot, [Sargent] wrote "After I seen them [the police] throwing them flash grenades into the crowd I had to get off the ladder and go get me some." In another post-riot message, sent to a single other person, [Sargent] said[,] "I got two hits in on the same rookie cop and then he maced me," and "yeah every time he came in his visor was all full of [mace so] I knew [he] couldn't see s*** so I just jumped out from behind somebody punched him as hard as I could [right] in his [visor]." [Sargent] told another person that he "[p]unched the cop 3 times in their [visor]" and told a third person "[w]hatever I Duff that cop out twice." (A13-14) (first alteration added).

The government's sentencing memorandum added further details about Sargent's conduct. Sargent had driven from Massachusetts on January 5 to attend the then-President's January 6 rally (A63). After the rally, Sargent made his way to the Capitol. He waded through the dense crowds in the West Plaza until he reached the media tower in the middle of the crowd (A64). Sargent scaled the tower, filming himself doing so on his cell phone, commenting, "You thought I was going to come here and not climb the fucking ladder?" (A64). From his elevated position, he could see the still-intact police line guarding the West Plaza, the rioters thoroughly overwhelming the officers, the densely packed crowd, and how far back the crowd stretched (A64-66). *See also* A65-66 (still images from Sargent's video). On the video, Sargent narrated, "We got a clash of police going. We're on the ladder. We're going up. Shit's getting fucking rowdy out here now. We got flash bangs." (A65.)

Sargent then climbed down from the tower and made his way to the front of the crowd (A80). About two minutes before Sargent's assaults, rioters had broken the police line in the West Plaza (A81). Sargent's assaults thus came when the officers were about to regroup and retreat (A66), "during a moment when police were vulnerable and in disarray"

(A134). *See also* A67-69 (still images of Sargent's assaults from police body-worn camera). Officers soon retreated through a central staircase up to the Lower West Terrace, and into the Lower West Terrace tunnel—where they eventually endured more than two hours of brutal assaults by an angry mob (A70 n.4; A81).

In one of his videos, apparently taken just after the assaults, Sargent bragged, "Alright, we're pushing them back. We got gassed, we got pepper sprayed, and I duffed a cop in the face." (A70.) He then yelled at an officer, "What are you going to do? Gas us again?" (A70.) Another video, recorded in front of a police line in a different part of the Capitol, showed Sargent berating officers in riot gear (A70). Sargent appeared to call the officers "a bunch of fucking traitors," telling them, "you should be ashamed of yourselves, you took a fucking oath to the Constitution," and, "[F]uck you guys. You guys are either with them or with us." (A70.) There was no evidence that Sargent actually entered the Capitol (A133).

After the riot, Sargent repeatedly bragged about his assaults on Facebook (A70-71). He also looked for footage of his crime: "Tell me somebody got video of me punching the cops in their visor" (A70). Sargent's post-arrest interview with the FBI was filled with untruths,

minimizing statements, and sarcasm (see A71-72). When shown footage of himself stepping out of the crowd to push an officer, Sargent told the agents, "[Y]ou can extrapolate it and perceive it however you want . . . . I can perceive it as me swatting away a mosquito if you want." (A72.)

## Sentencing

### *Relevant Statutory and Guidelines Provisions*

The major legal dispute at sentencing—and the only dispute on appeal—centered on which section of the U.S. Sentencing Guidelines should be used for Sargent's two felony convictions (§ 111 and § 231).

Section 111 fixes punishments for anyone who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with" a federal officer or employee "while engaged in or on account of the performance of official duties." 18 U.S.C. § 111(a). If the acts "constitute only simple assault," the maximum imprisonment is one year. *Id.* If the acts involve "physical contact with the victim" or "the intent to commit another felony," the maximum is eight years. *Id.* And if the perpetrator "uses a deadly or dangerous weapon" or "inflicts bodily injury," the maximum is twenty years. *Id.* § 111(b). The Guidelines provide that a § 111 conviction should be sentenced under Guideline § 2A2.2 or § 2A2.4. *See U.S. Sentencing*

*Commission Guidelines Manual* app. A at 558 (2021) [hereinafter U.S.S.G.].

Section 2A2.2 applies to "aggravated assault." It begins with a base offense level of 14 in § 2A2.2(a), and it specifies various offense characteristics that may increase the offense level in § 2A2.2(b). Application note 1 of § 2A2.2 defines "aggravated assault" as "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony."

Section 2A2.4 applies to "obstructing or impeding officers." It begins with a base offense level of 10 in § 2A2.4(a). But in § 2A2.4(c) it adds: "If the conduct constituted aggravated assault, apply §2A2.2."

Section 231(a)(3) makes it unlawful to "commit any act to obstruct, impede, or interfere with any . . . law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects . . . the conduct or performance of any federally protected function" 18 U.S.C. § 231(a)(3); *see* A14. The

Guidelines do not specify a Guideline section for a § 231(a)(3) conviction, meaning that a court should "apply the most analogous offense guideline." U.S.S.G. § 2X5.1. All parties in this case agreed that the most analogous Guideline was initially § 2A2.4, which again would then trigger the cross-reference to § 2A2.2 "[i]f the conduct constituted aggravated assault." U.S.S.G. § 2A2.4(c).

## *Sentencing Hearing*

The Probation Office (Sealed Appendix (SA) 10-12 & n.4) and the government (A74-78; A111-17) agreed that § 2A2.2's aggravated-assault Guideline applied to both felonies. Sargent's conduct "constituted aggravated assault," as defined by the Guidelines, because the "conduct" underlying both convictions was "a felonious assault that involved . . . an intent to commit another felony"—namely, civil disorder. *See* U.S.S.G. § 2A2.2 application n.1. With adjustments for offense characteristics and acceptance of responsibility, the advisory Guidelines imprisonment range was 24 to 30 months (A74-78; SA10-12). The government allocuted for a 27-month sentence in the middle of that range (A92; A132).

Sargent disagreed, contending that § 2A2.4's Guideline for obstructing or impeding officers should apply. He argued the Sentencing

10

Commission had overstepped its authority by defining "aggravated assault" to include felonious assault with intent to commit another felony, so that definition was invalid (A28-32; A99-110). He also argued that the government had failed to establish an intent to commit another felony at the time of the assault (A32-38). Applying § 2A2.4 and adjustments, he contended, would lead to a Guidelines range of 8 to 14 months (A27). Regardless of which Guideline applied, Sargent sought a downward variance to six months of imprisonment (A27; A124). During the sentencing hearing, Sargent apologized for his conduct (A141-43).

Judge Hogan concluded that § 2A2.2 applied (A117-23). The court rejected Sargent's argument that the definition of aggravated assault was invalid, declaring it "appropriate" under *Stinson* v. *United States*, 508 U.S. 36 (1993) (A120). Further, Judge Hogan found that Sargent had assaulted the officer with the intent to engage in civil disorder, citing Sargent's "statements prior to coming down to the riot" and the sequence of events leading up to the assault: first "joining the riot, climbing up the platform or the media tower, viewing what he saw, that he then said he was coming down and joining in"; then "he came down, moved to the front of the line through a huge crowd and he assaulted the police officer"; and

then he took another swing after an officer "instructed him not to start attacking people" (A122-23; see A154). The correct Guidelines range, therefore, was 24 to 30 months of imprisonment (A123).

Considering the sentencing factors under 18 U.S.C. § 3553(a), the court expressed concern about many aspects of Sargent's conduct. Sargent "purposely came down from the media tower and joined in the fight when [he] saw it going on" (A144). He "contributed to the civil unrest" (A144-45). He assaulted a Capitol Police officer, then "bragged about [it] several times" (A145; A147). Still, the court thought that Sargent had genuinely changed since January 6 and no longer posed the same sort of threat going forward (see A147-48; A150). And the court was "affect[ed]" by Sargent's apology to police officers and those in the Capitol on January 6 (A150).

The court decided to vary downward, imposing a total sentence of 14 months of incarceration (A152). This was, the court noted, the top "of the lower range that your counsel felt would apply" if Sargent had been sentenced under § 2A2.4, rather than § 2A2.2 (*id.*).

## SUMMARY OF ARGUMENT

We agree that the best articulation of the level of deference owed to application note 1's definition of "aggravated assault" comes from *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), requiring a reasonable interpretation of a genuinely ambiguous term. But the precise standard of deference is immaterial to the dispute here. Under any standard, the Commission acted permissibly in defining § 2A2.2 "aggravated assault" to include felony assault with intent to commit another felony. The Guideline's text, structure, and underlying background principles all support that definition. Indeed, the structure makes clear that § 2A2.2 *requires* such a definition.

Beginning with the text, *Black's Law Dictionary* defines "aggravated assault" as "[c]riminal assault accompanied by circumstances that make it more severe, *such as the intent to commit another crime*." And other leading criminal-law commentators back up that definition, explaining that aggravated assault statutes often encompass assault with intent to commit another crime—indeed, that was a key point of criminalizing aggravated assault in the first place.

The structure establishes that application note 1's definition is not merely a reasonable interpretation of the Guideline, but mandatory. That is because the Guidelines typically require convictions under 18 U.S.C. § 113(a)(2)—assault with intent to commit a felony within maritime or territorial jurisdiction—to be sentenced under § 2A2.2, making clear that such offenses are "aggravated assault" for purposes of the Guideline. Moreover, Sargent's proposal to limit § 2A2.2 to assault using a dangerous weapon or causing serious bodily injury would create surplusage and conflict with this Court's § 2A2.2 case law.

Finally, history, purpose, and background principles support application note 1's definition. Federal statutes consistently treat assault with intent to commit another felony as a serious felony, comparable in severity to other forms of aggravated assault that Sargent embraces. By law, the Sentencing Commission is obliged to consider that treatment in enacting the Guidelines. Similarly, to the extent it has any relevance, state law likewise supports treating assault with intent to commit a felony as an "aggravated" form of assault.

14

## ARGUMENT

## The Sentencing Commission's Definition of "Aggravated Assault" in § 2A2.2 Controls.

### A.     Standard of Review and Degree of Deference

This Court owes no deference to the district court here, "review[ing] *de novo* the district court's interpretation of the Sentencing Guidelines in calculating a defendant's Sentencing Guidelines range." *United States v. Turner*, 21 F.4th 862, 865 (D.C. Cir. 2022) (citation omitted).

The level of deference owed to the Sentencing Commission's commentary, however, has proven more controversial. Before *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing Guidelines were "mandatory" and limited a district court's discretion to impose a non-Guidelines sentence. *Id.* at 227, 233. In *Stinson* v. *United States*, 508 U.S. 36 (1993), the Supreme Court addressed the role of Guidelines commentary under that mandatory regime and determined that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Id.* at 38.

15

In reaching that determination, the Court drew an "analogy" to the principles of deference applicable to an executive agency's interpretation of its own regulations. *Stinson*, 508 U.S. at 44. The Court stated that, under those principles, as long as the "agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Id.* at 45 (quoting *Bowles* v. *Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). The Court acknowledged that the analogy was "not precise," but nonetheless viewed affording "this measure of controlling authority to the commentary" as the appropriate approach in the particular circumstances of the Guidelines. *Id.* at 44-45.

In 2019, the Supreme Court revisited the deference owed to agency regulations in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). *Kisor* rejected a request to overrule *Auer* v. *Robbins*, 519 U.S. 452 (1997), and *Seminole Rock*, 325 U.S. 410, which would have "discard[ed] the deference" afforded under those decisions to "agencies' reasonable readings of genuinely ambiguous regulations." *Kisor*, 139 S. Ct. at 2408; *see Auer*, 519 U.S. at 461 (stating that an agency's interpretation of its own regulation is "controlling unless 'plainly erroneous or inconsistent with

16

the regulation'") (quoting, indirectly, *Seminole Rock*, 325 U.S. at 414). Still, the Court took *Kisor* as an opportunity to "restate, and somewhat expand on," the limiting principles for deferring to an agency's interpretation of its own regulation. 139 S. Ct. at 2414.

"First and foremost," *Kisor* explained, "a court should not afford *Auer* deference unless the regulation is genuinely ambiguous." 139 S. Ct. at 2415. "And before concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction": specifically, "the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Id.* (citation omitted). Second, even "[i]f genuine ambiguity remains," "the agency's reading must still be 'reasonable.' In other words, it must come within the zone of ambiguity the court has identified after employing all its interpretive tools." *Id.* at 2415-16 (citation omitted). Third and finally, "a court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Id.* at 2416. It does so by asking whether the interpretation is the agency's official position, implicates the agency's expertise, and reflects the agency's "fair and considered judgment." *Id.* at 2416-17.

Since *Kisor*, circuits have divided on whether *Kisor*'s restatement applies to the Sentencing Commission's commentary explaining or interpreting a Guideline. *See United States v. Vargas*, 74 F.4th 673, 678 nn.2-3 (5th Cir. 2023) (en banc) (laying out circuit split).

The government has taken the position that *Kisor* sets forth the authoritative standards for determining whether particular commentary is entitled to deference. *E.g.,* Brief for United States in Opposition 15, *Tabb v. United States*, 141 S. Ct. 2793 (2021) (mem.) (No. 20-579), 2021 WL 637240. *Kisor* provides the governing standards for determining whether a court must defer to an executive agency's interpretation of a regulation. *See* 139 S. Ct. at 2414-18. And *Stinson* reasoned that—by "analogy," albeit "not [a] precise" one—the Commission's commentary interpreting the Guidelines should be treated the same way. 508 U.S. at 44; *see id.* at 44-46. Indeed, *Kisor* cited *Stinson* as one of the "legion" of pre-*Auer* decisions "applying *Seminole Rock* deference," 139 S. Ct. at 2411 n.3 (plurality opinion), suggesting that *Kisor*'s restatement of rules applies to the Guidelines commentary.

The commentary's definition of "aggravated assault" in application note 1 accordingly controls as long as the meaning of "aggravated

18

assault" in § 2A2.2 is at least "genuinely ambiguous," and the commentary's definition of the term is "reasonable."[1]

### B.    Argument

Full consideration of the traditional tools of construction make clear that "aggravated assault" in § 2A2.2 unambiguously includes a felonious assault involving an intent to commit another felony. At the very least, the term is ambiguous, and the commentary's definition is reasonable. The text, structure, and background legal principles all support application note 1's definition.

### 1.    Text and plain meaning

The precise circumstances that make an assault sufficiently "aggravated" to qualify as "aggravated assault" have varied over time and between jurisdictions. But the plain, traditional meaning of the term

---

[1] Before affording deference, *Kisor* also requires that "the character and context of the agency interpretation entitle[ ] it to controlling weight." 139 S. Ct. at 2416. But there does not appear to be any dispute—in general or as to § 2A2.2 specifically—that the Sentencing Commission's interpretive commentaries set forth the Commission's official position, implicate its expertise, and reflect its fair and considered judgment. *Id.* at 2416-17. Indeed, those characteristics of the commentary are in significant part what led *Stinson* to embrace deference to the commentary in the first place. *See* 508 U.S. at 45-46.

permissibly includes assaults committed with the intent to commit another crime, indicating that the Sentencing Commission's decision to employ that traditional understanding is at least a reasonable interpretation of an ambiguous term.

To begin, *Black's Law Dictionary* defines "aggravated assault" as "[c]riminal assault accompanied by circumstances that make it more severe, *such as the intent to commit another crime* or the intent to cause serious bodily injury, esp. by using a deadly weapon." Assault, *Black's Law Dictionary* (11th ed. 2019) (emphasis added); *see also* Intent, *Black's Law Dictionary* (explaining that "intent to kill" is "a state of mind that, if found to exist during an assault, can serve as the basis for an aggravated-assault charge"). It is hard to imagine a more emphatic rejection of Sargent's contention that "aggravated assault" unambiguously *excludes* assault with intent to commit another crime. After all, *Black's* is "[t]he leading law dictionary." *Bellagio, LLC v. NLRB*, 863 F.3d 839, 848 (D.C. Cir. 2017). And the first circumstance it identifies as transforming an ordinary assault into an aggravated assault is the accompanying "intent to commit another crime."

20

The textual analysis need not rest on *Black's* alone, however. *Black's* definition flows from the traditional understanding of aggravated assault. As the Model Penal Code commentaries explain, aggravated assault was an early statutory crime, created to provide an intermediate felony between the common law offenses of misdemeanor battery and mayhem. *See 2 Model Penal Code* § 211.1 cmt. 1(c) (Official Draft and Revised Commentaries 1980). (Assault is an attempted battery. *See id.* cmt. 1(b).) "The result was the development of basically two types of aggravated offenses of the assault or battery variety." *Id.* cmt. 1(c). The first type—reflected in subparts (a)-(c) of application note 1—"focus[ed] upon the means by which the actor caused or threatened injury, the person upon whom the injury or threat was inflicted, and the seriousness of the injury caused or threatened." *Id.* (footnotes omitted). The second type—reflected in the disputed subpart (d) of its definition—"create[d] statutory felonies punishing assault with intent to commit murder, rape, or some other serious offense." *Id.* While the precise list of underlying intended felonies varied by state, many included assault with intent to commit any other felony (or even any other crime). *See id.* n.39, n.43.

21

Sargent relies heavily on the Model Penal Code in his brief (see Br. 20-21), because the Model Code itself defines "aggravated assault" to occur when a person "(a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; or (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon." *Model Penal Code* § 211.1(2). But that provision is a proposal for how future penal codes *should* define "aggravated assault," not a description of what a standalone reference to "aggravated assault" *actually means*. Indeed, the commentaries acknowledge that their proposed aggravated-assault offense is part of "a substantial restructuring of prior law" proposed by the Code, including by toughening attempt liability. *Id.* cmt.2. That proposed "structure of the Model Code assault offense eliminates the necessity for a series of 'assault-with-intent-to' offenses representing an intermediate grade between attempt and the completed offenses of rape, murder, and other serious felonies." *Id.* Still, the drafters allow, "a number of states . . . have retained such [assault-with-intent-to] offenses in recent revisions" of their penal codes. *Id.* cmt.1(c) & n.43.

22

Leading treatises likewise recognize that one classic form of aggravated assault is assault with intent to commit another crime. *Wharton's* begins its discussion of aggravated assault by explaining: "An assault is commonly aggravated when it is accompanied by an intent to commit a specified felony." 2 Jehns D. Ohlin, *Wharton's Criminal Law* § 23:11 (16th ed. Sept. 2022 update). Professor LaFave similarly opens: "In all jurisdictions statutes punish, more severely than simple assault, such aggravated assaults as 'assault with intent to murder' (or to kill or rob or rape) and 'assault with a dangerous or deadly weapon.'" 2 Wayne R. LaFave, *Substantive Criminal Law* § 16.3(d) (3d ed. Oct. 2022 update) (footnotes and brackets omitted). Again, while these sources do not claim that "aggravated assault" *must* include assault with intent to commit other crimes, they make clear that it *may*. That at least establishes ambiguity as to the meaning of "aggravated assault" and shows that the Commission's definition in application note 1 is reasonable.

## 2.    Structure

While the plain meaning of "aggravated assault" confirms that the Commission's definition is permissible, the structure of § 2A2.2 shows that the term "aggravated assault" there *must* include assault with

23

intent to commit another felony, and Sargent's alternative definition does not work. Three structural considerations establish the point.

*First*, and perhaps most definitive, is the Guidelines' treatment of general federal assaults with intent to commit another felony. Under 18 U.S.C. § 113(a)(2), "[w]hoever, within the special maritime and territorial jurisdiction of the United States, is guilty of . . . [a]ssault with intent to commit any felony, except murder or a violation of section 2241 [aggravated sexual abuse] or 2242 [sexual abuse]," is subject to imprisonment up to ten years. The Statutory Index (Appendix A) of the Guidelines specifies four potential Guidelines for a § 113(a)(2) conviction: 2A2.2, 2A3.2, 2A3.3, and 2A3.4. *See* U.S.S.G. app. A at 558. The last three Guidelines listed are limited to sexual abuse. *See* U.S.S.G. §§ 2A3.2 (statutory rape or attempt); 2A3.3 (sexual abuse of a ward or attempt); 2A3.4 (abusive sexual contact or attempt). Thus, a defendant convicted of federal assault with intent to commit a felony besides murder or sexual abuse—like assault with intent to commit robbery or kidnapping—will be sentenced under U.S.S.G. § 2A2.2 for aggravated assault.

Importantly, the Statutory Index is part of the "text and structure of the Guidelines" whose use is required by U.S.S.G. § 1B1.2(a), not mere

24

commentary. *United States v. McKeever*, 824 F.3d 1113, 1121 (D.C. Cir. 2016). So the Statutory Index's treatment of a § 113(a)(2) conviction unambiguously establishes that assault with intent to commit another felony is an "aggravated assault" for purposes of § 2A2.2, and it should be sentenced under that Guideline. Application note 1's definition of "aggravated assault" to include felony assault involving "an intent to commit another felony" is thus not merely a reasonable interpretation, but is actually dictated by the Guidelines.[2]

*Second*, the structure of § 2A2.2 likewise cannot be squared with Sargent's proposed definition of "aggravated assault." According to Sargent (Br. 22), "aggravated assault" is unambiguously limited to offenses involving dangerous weapons or bodily injury, meaning that application note 1's definition of the term would be narrowed to its first

---

[2] The point is underscored by the Statutory Appendix's treatment of convictions under an earlier version of the § 113 statute. In the earlier version, § 113(b) covered "[a]ssault with intent to commit any felony, except murder or a felony under chapter 109A [sexual abuse]." 18 U.S.C. § 113(b) (1988). For convictions under that earlier version (involving offenses committed prior to September 13, 1994), the current Statutory Appendix lists *only* Guideline § 2A2.2. *See* U.S.S.G. app. A at 558. The Statutory Appendix in the original 1987 Sentencing Guidelines likewise listed only § 2A2.2 for a § 113(b) conviction.

two subsections: "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; [or] (B) serious bodily injury." But that definition would turn § 2A2.2(a) into surplusage. *See Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) ("[T]he interpretive canon against surplusage" is "the idea that 'every word and every provision is to be given effect [and that n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.'").

Under § 2A2.2(a), the base offense level for aggravated assault is 14. Section 2A2.2(b) then lists seven "specific offense characteristics" that increase the offense level. Subsection (b)(2) provides: "If (A) a firearm was discharged, increase by 5 levels; (B) a dangerous weapon (including a firearm) was otherwise used, increase by 4 levels; (C) a dangerous weapon (including a firearm) was brandished or its use was threatened, increase by 3 levels." Subsection (b)(3) provides: "If the victim sustained bodily injury, increase the offense level according to the seriousness of the injury," with a 3-level increase for bodily injury, a 5-level increase for serious bodily injury, and a 7-level increase for permanent or life-threatening bodily injury.

Under Sargent's definition, increases for the "specific offense characteristics" will always be triggered, as an aggravated assault by his definition will inevitably include either use of a dangerous weapon (a 4-level bump under § 2A2.2(b)(2)) or a serious bodily injury (a 5-level bump under § 2A2.2(b)(3)). So the base offense level of 14 provided by § 2A2.2(a) will never be the final offense level. Instead, under Sargent's view, the base offense level is really 18, as every aggravated assault will trigger at least a 4-point increase for "specific offense characteristic." The base offense given in § 2A2.2(a) becomes superfluous, conflicting with the canon against surplusage.

*Third,* and relatedly, Sargent's proposed interpretation is at odds with this Court's analysis of § 2A2.2 in *United States v. Valdez-Torres*, 108 F.3d 385 (D.C. Cir. 1997). There, this Court recognized that "impermissible double-counting" may occur under the Guidelines if an enhancement for "specific offense characteristics" "duplicate[s] an essential element of the offense"—that is, if everyone who falls within a particular Guideline has necessarily committed some specific conduct, yet that conduct nonetheless triggers an additional Guideline

27

enhancement. *Id.* at 389.[3] Yet *Valdez-Torres* rejected the defendant's contention that "considering his use of the [weapon] both to select section 2A2.2 and to enhance his sentence pursuant to section 2A2.2(b)(2)(B)" fell into that trap. *Id.* Rather, the Court explained, "Section 2A2.2 applies to different types of aggravated assault, of which assault with a dangerous weapon is but one." *Id.* "A felonious assault involving 'serious bodily injury' *or 'an intent to commit another felony' can constitute aggravated assault* even without the use of a dangerous weapon." *Id.* n.10 (emphasis added). "The enhancement for use of a dangerous weapon thus does not duplicate an essential element of aggravated assault but instead is properly used to distinguish among sentences imposed pursuant to the section for different kinds of assaults." *Id.* at 389.

*Valdez-Torres* thus relied on application note 1's *inclusion* of assault with intent to commit another felony. Absent that definition, the

---

[3] *See also United States v. LaBonte*, 520 U.S. 751, 764-65 (1997) (Breyer, J., dissenting) ("[The Guidelines] assign a number—called a 'Base Offense Level'—to the behavior that constituted the crime itself. . . . They next tell the judge to look to the *way* in which the offender committed the crime; and they provide specific upward adjustments in light of *certain aggravating features* of the criminal behavior—adjustments they call 'Specific Offense Characteristics.'") (second emphasis added).

"impermissible double-counting" challenge would have looked much stronger. As explained above, every aggravated assault under § 2A2.2 would have qualified for an enhancement under § 2A2.2(b)(2) or (b)(3); subsections (b)(2) and (b)(3) would have no longer seemed to "*distinguish* among sentences . . . for different kinds of assaults." *Valdez-Torres*, 108 F.3d at 389 (emphasis added). The binding interpretation of § 2A2.2 reflected in *Valdez-Torres* thus cannot be squared with Sargent's proposed definition cutting assault with intent to commit a felony.

### 3.    Background and Purpose

Finally, the stable history of § 2A2.2, the Commission's statutorily defined purposes, and the background recognition in federal and state law of the seriousness of assaults with intent to commit other crimes all support the definition of "aggravated assault" in application note 1.

### a.    History of § 2A2.2

In the first Guidelines Manual in 1987, the Commission divided assaults into three categories of decreasing seriousness: assault with intent to murder (§ 2A2.1), aggravated assault (§ 2A2.2), and minor assault (§ 2A2.3). U.S.S.G. §§ 2A2.1 to .3 (1987). And since that first Manual, the definition of "aggravated assault" in § 2A2.2 application note

1 has included assault with intent to commit another felony: "'Aggravated assault' means a felonious assault that involved (a) a dangerous weapon with intent to do bodily harm (*i.e.*, not merely to frighten), or (b) serious bodily injury, or (c) an intent to commit another felony." *Id.* § 2A2.2 application n.1. The Guidelines were amended in 1988 to add § 2A2.4 (Obstructing or Impeding Officers). *See* U.S.S.G. app. C (2021) (amend. 64). And application note 1 was amended in 2014 to add assault that involved "strangling, suffocating, or attempting to strangle or suffocate" into the definition of "aggravated assault." *See id.* (amend. 781).

Under the current Guidelines, assaults with intent to commit murder (§ 2A2.1) start with a base offense level of at least 27, which (assuming no other adjustments or enhancements and no prior criminal history) would translate to a recommended range of 70-87 months in prison. "Aggravated assaults" (§ 2A2.2) start with a base offense level of 14, which (with the same assumptions) would translate to a range of 15-21 months in prison. Basic assaults (§ 2A2.3) get either a base offense level of 7 (if the offense involved physical contact, or a dangerous weapon was possessed and threatened) or of 4 (otherwise), both of which would translate to a range of 0-6 months in prison (with probation permissible).

Finally, a special Guideline (§ 2A2.4) for obstructing or impeding officers (including by assaulting them) provides a base offense level of 10, which would translate to a range of 6-12 months in prison (with intermittent confinement, community confinement, or home detention permissible). *See* U.S.S.G. ch. 5, pt. A.

Sargent identifies no successful challenges to application note 1 in the 35 years it has been part of the Guidelines.[4]

### b.   Federal Law

By statute, the Sentencing Commission must consider the "grade of the offense" and the "community view of the gravity of the offense" in establishing the appropriate Guideline. *See* 28 U.S.C. § 994(c)(1), (4). The assault Guidelines indeed reflect federal law's general sorting of the seriousness of assault crimes.

---

[4] In addition to Judge Hogan's rejection of the argument below, Judge Kollar-Kotelly recently rejected a similar challenge in *United States v. Salvador Sandoval*, No. 21-195-02 (D.D.C. Aug. 3, 2023) (ECF 143). *See also United States v. Page*, 84 F.3d 38, 43 (1st Cir. 1996) (rejecting challenge to § 2A2.2(b)(3)(B)'s enhancement for "serious bodily injury" under *Stinson*, even when statute contains no such enhancement, explaining that "[t]here is no reason why the Guidelines may not make their own classifications within the statutes, and hence definitions which the courts must observe, so long as these are not internally inconsistent or in violation of the Constitution or a federal statute").

Although the U.S. Code contains no general crime called "aggravated assault," it has various aggravated forms of assault, including assault with intent to commit another crime. And whereas federal law routinely makes simple assault a misdemeanor, it grades assault with intent to commit another felony as a serious Class D felony. *See* 18 U.S.C. § 3559(a). For example, just looking at Chapter 7 (Assault) of Title 18: Section 111—barring assault on federal officers—authorizes imprisonment up to one year for simple assault, but up to eight years for assault with the intent to commit another felony. Section 113—punishing assault within maritime or territorial jurisdiction—authorizes up to six months for simple assault, but up to 10 years for assault with intent to commit any felony. And § 115—prohibiting retaliation against a federal official or judge by assaulting his or her family—allows up to one year for simple assault, but up to ten years for assault with the intent to commit another felony.

Perhaps the best reflection of federal law's assault ranking is found in § 113, which outlaws eight different types of assault and assigns them differing penalties. The penalties there notably parallel the assault Guidelines: The longest penalty is for assault with intent to commit

32

murder or sexual assault, covered by § 2A2.1 (or the specialized sexual abuse provisions in § 2A3.1, *see* U.S.S.G. § 2A2.2 background). The next longest penalties are for assault with intent to commit any other felony, assault with a dangerous weapon with intent to do bodily harm, assault resulting in serious bodily injury, or assault of a partner by strangling or suffocating—the precise categories covered by § 2A2.2 and qualifying as "aggravated assault" there. Next is domestic or child abuse resulting in substantial bodily injury, covered by § 2A2.3 but subject to a substantial 4-level enhancement under § 2A2.3(b)(1)(B). Last are misdemeanor assaults, covered by § 2A2.3. Federal law's most comprehensive sorting of the gravity of various types of assaults thus matches the Guidelines' sorting almost exactly—including by classifying assault with intent to commit a felony as an "aggravated" form of assault comparable to assault with a dangerous weapon or assault resulting in serious bodily injury.

Were Sargent to prevail in narrowing aggravated assault under § 2A2.2, by contrast, assault with intent to commit another crime would lose its proper place in the assault grading system. Instead, it would be treated as equivalent to simple assault, with no consideration of the intent that renders it a serious federal felony. Indeed, under § 2A2.3, a

misdemeanor simple assault involving physical contact would be treated *more* harshly than a non-contact felony assault with intent to commit another felony. Given the Commission's obligation under § 994(c) to consider statutory grading of offenses, Sargent's proposed inversion of the normal assault sorting undercuts his position.

Instead of looking at § 113, Sargent emphasizes (Br. 21-23) the structure of § 111. Again, § 111 gives three penalties for assaulting or interfering with a federal officer: (1) up to one year in prison for simple assault; (2) up to eight years in prison where the acts involve "physical contact with the victim" or "the intent to commit another felony"; and (3) an "[e]nhanced penalty" of up to 20 years in prison where the defendant "uses a deadly or dangerous weapon" or "inflicts bodily injury."

But § 111 is a poor prototype for deciding how federal law regards different forms of assaults. It is not especially comprehensive in the types of assaults it covers—unlike § 113, it has no offense of assault with intent to commit murder (the most serious assault category reflected in § 2A2.1) and no gradation based on the seriousness of injury. Further, whereas a normal non-aggravated assault conviction would land in the general assault Guideline in § 2A2.3 (with a minimum base offense level of 4),

34

§ 111 convictions are routed to the far more serious § 2A2.4 (with a minimum base offense level of 10). The Guidelines also treat § 111 convictions more seriously in other ways.[5] In short, § 111 convictions are a narrow band of assaults that already get special Guidelines treatment. Section 111 does not reveal federal law's broader treatment of assault convictions in the way that Sargent imagines. In any event, the Guidelines are sufficiently consistent with § 111's sorting.[6]

---

[5] *See, e.g.*, U.S.S.G. § 2A2.2(b)(7) ("If the defendant was convicted under 18 U.S.C. § 111(b) or § 115, increase by 2 levels."); *id.* § 3A1.2 (potential upward adjustment for official victim); *see also* Federal Judiciary Protection Act of 2002, Pub. L. No. 107-273, § 11008(e), 116 Stat. 1758, 1819 (requiring Commission "to ensure punishment at or near the maximum penalty for the most egregious conduct" under § 111).

[6] Section 111 contains five types of assault. Assuming no other adjustments or offense characteristics, those assaults would receive the following Guidelines offense levels: A conviction for simple assault under § 111(a) carries offense level 10 under § 2A2.4(a). Assault that involves physical contact under § 111(a) carries offense level 13 under § 2A2.4(b)(1)(A). Assault with intent to commit another felony under § 111(a) carries offense level 14 under § 2A2.2(a). Assault that inflicts bodily injury under § 111(b) carries offense level 15 under § 2A2.4(b)(1)(A) & (2), though if it inflicts "serious bodily injury," the offense level jumps to 21 under § 2A2.2(b)(3)(B) & (7). And assault using a dangerous weapon (assuming intent to cause bodily injury) carries at least offense level 20 under § 2A2.2(b)(2)(B) & (7). Many § 111 convictions that trigger the § 2A2.2 Guideline will receive a further 6-point upward adjustment under § 3A1.2(b) (official victim) (see, e.g., SA11).

### c.     State Law

Finally, to the extent it has any relevance here, state law likewise supports application note 1's definition.

At the outset, it is not clear why state law would have any relevance here. The question on appeal is whether a pending *federal* conviction should be classified as an "aggravated assault" and subject to a higher sentencing range under federal Guideline § 2A2.2. Scrutinizing state law seems to add little to the analysis. Sargent's invocation of state statutes (Br. 20-21) appears to be taken from a distinct legal inquiry: deciding whether a prior *state* conviction counts as a "generic" specified crime. *See, e.g.*, *Quarles v. United States*, 139 S. Ct. 1872 (2019) (whether prior Michigan conviction "is burglary" under the Armed Career Criminals Act, qualifying for enhanced sentence for recidivist offenders); *United States v. Vederoff*, 914 F.3d 1238, 1243-46 (9th Cir. 2019) (whether prior Washington conviction "is . . . aggravated assault" under U.S.S.G. § 4B1.2, qualifying for career-offend treatment under Guidelines).[7]

---

[7] Despite surface similarities, the generic-crime inquiry differs in key ways. *See, e.g.*, *Vederoff*, 914 F.3d at 1244-45 (declining to consider § 2A2.2's definition of "aggravated assault" in defining generic "aggravated assault" under § 4B1.2). To begin, a generic-crime inquiry

(continued . . . )

In any event, state law makes clear that it is reasonable to define "aggravated assault" in § 2A2.2 to include assault with intent to commit another felony. Indeed, even accepting Sargent's tally of state aggravated-assault statutes for the sake of argument (see Br. 20-21 & nn.5-6), they point to ambiguity in the definition of "aggravated assault," with one reasonable interpretation including assault with intent to commit another felony. Sargent acknowledges that the statutes "include a variety of factors" making an assault qualify as "aggravated," "most commonly serious/great bodily injury, firearms, deadly or dangerous weapons, impeding breathing or blood circulation, and the nature of the victim" (Br. 20-21). Put another way, there is no definitive definition of "aggravated assault," and instead the variability of aggravating factors indicates at least ambiguity as to the term's meaning. Moreover, Sargent acknowledges that three states—Florida, Kansas, and New Mexico—*do*

---

seeks to define "aggravated assault" in the abstract, whereas here we seek the meaning of "aggravated assault" *as used in Guideline § 2A2.2*. Second, the generic-crime inquiry resorts to the categorical approach, turning on the elements of the crime, whereas § 2A2.2 asks whether the underlying *conduct* constituted aggravated assault. Third, and perhaps most importantly, the generic-crime inquiry seeks to find a *consensus* definition of "aggravated assault," whereas here we ask only whether the definition in § 2A2.2 is *reasonable*.

define "aggravated assault" to include assault with intent to commit any other felony (Br. 20 & n.5) (citing Fla. Stat. § 784.021; Kan. Stat. § 21-5412; N.M. Stat. § 30-3-2). Georgia does likewise for certain felonies. *See* Ga. Code § 16-5-21(a) ("[a] person commits the offense of aggravated assault when he or she assaults: (1) With intent to murder, to rape, or to rob"). The fact that multiple states define "aggravated assault" the same way as the challenged portion of § 2A2.2's definition marks the Sentencing Commission's definition as reasonable. So even on Sargent's analysis, § 2A2.2's definition should get deference.

But Sargent's tally improperly focuses on state statutes *captioned* "aggravated assault," ignoring the substance of state law. Even in the generic-crime analysis, courts look to the substantive requirements of state law, "regardless of its 'exact definition or label.'" *Quarles*, 139 S. Ct. at 1877 (quoting *Taylor v. United States*, 495 U.S. 575, 599 (1990)). And criminal codes often include aggravated forms of assault that they do not call "aggravated assault." After all, federal law contains no general "aggravated assault" provision, yet everyone agrees that at least some federal convictions are properly designated "aggravated assaults" under § 2A2. Similarly, Washington's statute covering the sort of conduct that

Sargent thinks is aggravated assault—assault with a deadly weapon or that inflicts substantial bodily harm—is called "assault in the second degree." *Vederoff*, 914 F.3d at 1244 (discussing Wash. Rev. Code § 9A.36.021); *see also, e.g.*, *Taylor*, 495 U.S. at 591 ("Michigan has no offense formally labeled 'burglary,'" calling it "breaking and entering").

When looking at substantive requirements, it is clear that many state codes—like the U.S. Code—indeed include aggravated forms of assault that impose substantially higher penalties for assault with intent to commit another crime. By the Ninth Circuit's recent count, six states and the District of Columbia have felony statutes punishing assault with intent to commit any felony, five states have felonies for assault with the intent to commit a narrower set of crimes, and six states have similar felonies for assault during the commission of a felony. *See Vederoff*, 914 F.3d at 1245-46 nn.6-8 (citing statutes). *Vederoff*'s count omits at least two other states with similar crimes.[8] That means 20 of 51 states

---

[8] *See* Idaho Code §§ 18-909 to -912 (assault and battery with intent to commit a serious felony); Okla. Stat. tit. 21, § 681 (assault with intent to commit any felony). In addition, Maryland makes assault with intent to murder, rape, rob, or commit certain sexual offenses a "crime of violence" subject to a mandatory enhanced sentences for recidivists. *See* Md. Code, Crim. Law § 14-101(16)-(21). Although Maryland no longer maintains

(continued . . . )

(including D.C.)—almost 40%—have an aggravated form of assault akin to assault with intent to commit another crime. And even that tally is likely an undercount.[9]

State law thus buttresses the background established by federal law: Assault with intent to commit another crime is a common felony form of assault, subject to harsher punishments. For that reason too, it was permissible for the Sentencing Commission to include it among the crimes qualifying as "aggravated assault" in § 2A2.2.

---

separate offenses for those crimes, *see infra* note 9, that continuing "crime of violence" treatment indicates that assault with intent to commit certain crimes nonetheless remains a worse form of assault there.

[9] Almost all states appear to have had a felony of assault with intent to commit some other crime at some point. At least two states that *Vederoff* classified as having no such crime now, *see* 914 F.3d at 1246 n.9, seem to have had such statutes in 1987, when the Commission first defined "aggravated assault" to include assault with intent to commit another crime. *See* Md. Code, Art. 27, § 12 (repealed 1996) (assault with intent to murder, rape, or rob); Tenn. Code § 39-2-101 (repealed 1989) (assault with intent to commit another felony). Given the tertiary importance of the precise count of state statutes here, though, we have not attempted a comprehensive historical 50-state survey of when exactly each state last had a felony for assault with intent to commit another crime on its books. The *Vederoff* tally sufficiently establishes the reasonableness of the Commission's definition.

40

## CONCLUSION

WHEREFORE, the government respectfully submits that the judgment of the District Court should be affirmed.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
NICHOLAS P. COLEMAN
MICHAEL J. ROMANO
Assistant United States Attorneys

/s/

ERIC HANSFORD
D.C. Bar #1017785
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Eric.Hansford@usdoj.gov
(202) 252-6829

41

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this brief contains 8,339 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

                                    /s/
                                    ERIC HANSFORD
                                    Assistant United States Attorney


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing Brief for Appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, Judith Mizner, Esq., Assistant Federal Public Defender, on this 21st day of August, 2023.

                                    /s/
                                    ERIC HANSFORD
                                    Assistant United States Attorney